IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| NATIONAL HERITAGE FOUNDATION, INC., <br> Plaintiff, <br> <br> v. <br> <br> PHILADELPHIA INDEMNITY INSURANCE COMPANY, <br> Defendant. | Case No. 1:12-cv-447 |

## MEMORANDUM OPINION

In this diversity insurance dispute, plaintiff insured makes certain claims for coverage and indemnification under policies issued by defendant insurer, while defendant insurer contends, at this stage, that the claims are barred by a release plaintiff signed in settlement of an earlier lawsuit between the parties. At issue therefore, on cross motions for summary judgment, is the scope of the release. For the reasons that follow, the release, properly construed, bars some, but not all of plaintiff's claims, and thus the parties' summary judgment motions must each be granted in part and denied in part.

I.

The facts material to the summary judgment determination are undisputed and may be succinctly stated. Plaintiff National Heritage Foundation, Inc. ("NHF") is a non-profit Georgia corporation that administers donor-advised funds. Donor-advised funds are an alternative to the typical philanthropic device of a donor-created private charitable foundation. In the case of a donor-advised fund, the donor does not create a foundation, but instead contributes money to the sponsoring foundation—in this case NHF—which then distributes the funds to other charitable organizations in the donor's name. The donors may advise the sponsoring foundation how they

1

would like their contributions distributed or invested, but those recommendations are not binding on the sponsoring foundation. *See* 26 U.S.C. § 4966(d)(2); *see also Behrmann, et al. v. National Heritage Foundation, Inc.*, 663 F.3d 704, 707 n. 1 (4th Cir. 2011) (describing the function of donor-advised funds).

Defendant Philadelphia Indemnity Insurance Company ("PIIC") is an insurance company incorporated in Pennsylvania with its principal place of business in Bala Cynwyd, Pennsylvania. Beginning in 2005, if not before, and continuing at least until 2009, PIIC issued directors' and officers' insurance policies to NHF.

Problems between the parties began in 2005 when a family—the Mancillas family—sued NHF for mismanaging in various ways the family's funds that had been entrusted to NHF. The suit was brought under the name *Mancillas v. Hewitt* and was filed in the 404th Judicial District Court of Cameron County Texas (hereinafter "the Mancillas Litigation"). The Mancillas Litigation was tried to a jury, and the family won a $6 million verdict against NHF.

Ostensibly as a result of the Mancillas Litigation, NHF, on January 24, 2009, filed for Chapter 11 Bankruptcy in United States Bankruptcy Court for the Eastern District of Virginia. Not long thereafter, NHF also filed suit against PIIC on May 7, 2009 in a Texas state court (hereinafter "the Litigation"), alleging not only that PIIC had failed to provide a defense and indemnification in the Mancillas Litigation, pursuant to the 2005-2006 PIIC insurance policy issued to NHF, but also that PIIC's failure to do so was the proximate cause of NHF's Chapter 11 Bankruptcy. In the Litigation, NHF sought to recover "actual, consequential, statutory, treble, and exemplary damages, as well as attorney's fees," claiming these damages all arose out of PIIC's improper denial of coverage that in turn led to NHF's bankruptcy. In the end, the Litigation was resolved on November 23, 2010, when the parties entered into the Compromise,

2

Settlement Agreement, Full and Final Release (the "Release") at issue here. Pursuant to the Release, PIIC paid NHF $18 million to settle the Litigation, and PIIC, in return, received a release of claims in the form of the Release. The Release is divided into two parts. The first part, as is typical of releases, uses broad language to waive certain defined claims. Specifically, it states as follows:

> Upon receipt by National Heritage of the Funds, National Heritage ... releases and forever discharges Philadelphia ... from all claims, demands, causes of action, and damages asserted in, arising out of, or connected with the Litigation...

The second part of the Release excludes certain claims from the Release:

> [N]otwithstanding the foregoing, nothing herein shall be deemed to release any of the Philadelphia Released Parties from any other claims, demands, causes of action, and damages ("Other Claims"), including but not limited to Other Claims that National Heritage has or may have either under the Policy, which were not asserted in the Litigation, or under any other insurance policy issued to National Heritage by Philadelphia.

In further defining the released claims as those "asserted in, arising out of, or connected with the Litigation," the Release defines the "Litigation" as "Cause No. 2009-05-2987-H in the 444th Judicial District Court of Cameron County Texas," i.e. the Litigation brought by NHF against PIIC previously described.

The first group of released claims are those "asserted in" the Litigation. In the Recitals section, the Release specifically defines the damages asserted in the Litigation to include:

> a) Direct damages, including but not limited to:
> 1) Professional fees incurred in connection with the bankruptcy in the amount of $2,907,487;
> 2) Professional fees incurred in connection with the defense of the Underlying Mancillas Lawsuit in the amount of $232,822;
> 3) Payment to the Mancillas Family as a result of the NHF/Mancillas Family Settlement, including a cash payment of $3.0 million;
> 4) Pre-judgment interest in the amount of $92,142; and

3

5) Early withdrawal penalties incurred from liquidating donor
                funds in the amount of $555,619.
            b) Consequential damages, including but not limited to:
                1) Lost donations resulting from donors moving life insurance
                policies from National Heritage, post-bankruptcy, in an amount
                of $10,865,383;
                2) Lost donations resulting from National Heritage's
                bankruptcy filing in an amount of $46,041,027; and
                3) Lost returns relating to liquidating donor funds in an amount
                of $10,865,383.
            c) Treble and exemplary damages as might be allowed by common
            law, the Texas Insurance Code and/or Chapter 41, Texas Civil
            Practices & Remedies Code.

In this action, NHF seeks the payment of certain claims under the 2008-2009 directors' and officers' liability insurance policy PIIC issued to NHF. Specifically, NHF brings four claims in this action, which can be summarized as follows:

> (1) Defense costs and indemnification for the settlement with the Highbourne Foundation and John and Nancy Behrmann;
> (2) Defense costs and indemnification for the settlement with Maurice Townsley;
> (3) Defense costs incurred in defending against the appeal of the bankruptcy plan and the associated stay; and
> (4) Defense costs incurred in defending against Delores Anderson's claim.

PIIC defends by contending that each of the four claims brought in this suit is barred by the Release entered in the Litigation, while NHF asserts that the Release does not reach any of the claims.

## II.

The analysis of the question presented is informed by a further description of the four claims NHF asserts here, each of which is brought under the 2008-2009 PIIC directors' and officers' insurance policy issued to NHF.

First, NHF claims that, in contravention of PIIC's obligations under the 2008-2009 policy issued to NHF, PIIC wrongly failed to defend and indemnify NHF in connection with the

4

Highbourne/Behrmann claim and resulting $590,000 settlement. The Highbourne Foundation and its founders, John and Nancy Behrmann, filed a Proof of Claim in NHF's Bankruptcy Case on May 26, 2009. The Behrmanns claim that NHF "induced" them to establish Highbourne and make donations to NHF by:

> (a) publishing to the Behrmanns...numerous material misrepresentations, commitments and statements of alleged fact that were false, and (b) consciously omitting to advise the Behrmanns in respect of crucial material facts that in equity and good conscience should have been disclosed so as to make the matters that were represented to the Behrmanns not materially misleading.

Compl. ¶ 27. NHF seeks indemnification for this settlement, as well as a reimbursement of the defense costs incurred in defending against this claim. Accordingly, the first claim is for $590,000 plus defense costs.

In the second claim, NHF alleges that PIIC improperly failed to advance defense costs and to indemnify NHF for the $929,491.94 settlement of the Townsley Claim. On June 2, 2009, Maurice Townsley filed a Proof of Claim in NHF's bankruptcy case, claiming that one of NHF's directors made "negligent misrepresentations and omissions" to him and that NHF breached its fiduciary duty to him.

In the third claim, NHF seeks defense costs associated with certain creditors' appeal of NHF's original bankruptcy plan and the related motion to stay. This original bankruptcy plan provided for the release of individual NHF officers and directors from liability, prompting certain NHF creditors to object to the plan and file an appeal. The appeal was recently resolved when the Fourth Circuit remanded the issue to the Bankruptcy Court for further factual inquiry on the necessity of the release of the officers and directors. In the end, the Bankruptcy Court ruled on August 27, 2012 that the plan provision pertaining to the release of the individual

officers and directors was not supported by the record and was unenforceable. *In re National Heritage Foundation, Inc., Debtor*, 478 B.R. 216 (Bankr. E.D. Va. 2012).

Finally, NHF seeks defense costs associated with Delores Anderson's Proof of Claim. Although Ms. Anderson's Proof of Claim was ultimately dismissed because it was not timely filed, NHF argues that PIIC was obligated by the 2008-2009 directors' and officers' insurance policy to pay the defense costs it incurred in defending against Ms. Anderson's claim.

### III.

As is typical of diversity actions, the starting point in the summary judgment analysis is the choice of governing law, which in this case is disputed by the parties. To begin with, however, the parties do not dispute that under *Klaxon Co. v. Stentor Electric Manufacturing Company*, a district court sitting in diversity must apply the choice of law rules of the forum in which it sits. 313 U.S. 487, 496-97 (1941). As the parties correctly recognize, *Klaxon* dictates that Virginia's choice of law rules apply. At this point, however, the parties diverge. The Release states that it is to be "governed by, construed and enforced in accordance with the laws of the State of Texas," and PIIC correctly contends that this provision should be honored under Virginia's choice of law rules. This is so because Virginia law provides that when an agreement contains a choice of law provision, that provision is to be honored except in unusual circumstances, none of which are present here. *Higachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (citing *Tate v. Hain*, 181 Va. 402 (Va. 1943)). In opposition, NHF argues that Virginia's insurance choice of law provision found in Virginia Code § 38.2-312 controls. This argument fails; § 38.2-312 invalidates only choice of law provisions contained in insurance policies delivered in Virginia and concerning Virginia property; it does not operate to

invalidate choice of law provisions contained, as here, in contracts separate and apart from insurance policies. Because the Release is not an insurance policy, § 38.2-312 does not apply, and the Release will be interpreted in accordance with Texas law.[1]

## IV.

Under Texas law, "[t]he primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1994). Whether parol evidence is admissible to ascertain the parties' intentions depends on whether there is an ambiguity in the contract in question. *Id.* The parol evidence rule holds that when the parties have entered into a valid integrated agreement, parol evidence—evidence of prior or contemporaneous agreements—may not be considered. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008); *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 31 (1958). The Release contains an integration clause stating that the Release "constitutes the entire agreement and understanding among the parties." Accordingly, Texas law teaches that parol evidence is not admissible to construe the Release unless the Release is found to be materially ambiguous. And, whether a contract is ambiguous is a question of law to be decided by the court, considering the contract as a whole in light of the circumstances at the time the contract was signed. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). Texas law also teaches that a contract is only ambiguous if its language is "subject to two or more reasonable interpretations." *National Union Fire Ins.*, 907 S.W.2d at 520. And importantly, an agreement is not ambiguous simply because

---

[1] It must be noted, however, that this conclusion is limited to the construction and application of the Release; § 38.2-312 may dictate a different result in considering any as yet unaddressed questions of coverage or indemnification under any PIIC policy issued in Virginia.

7

the parties disagree on the meaning of a provision; for the agreement to be ambiguous, both interpretations must be reasonable. *Columbia Gas Transmission Corp. v. New Ulm Gas, LTD.*, 940 S.W.2d 587, 589 (Tex. 1996). Indeed, if a simple disagreement were enough to create an ambiguity, the exception would swallow the parol evidence rule.

Importantly, the parties here agree that the Release is unambiguous.[2] Yet, paradoxically, the parties have submitted evidence that might arguably be considered parol evidence under Texas law.[3] In any event, none of these documents is admissible to alter the plain meaning of the Release because the parties agree it is unambiguous. Therefore, the construction of the Release will be based entirely on the Release itself. And, in construing the Release, the "[l]anguage used by parties in a contract should be accorded its plain, grammatical meaning unless it definitively appears that the intentions of the parties would thereby be defeated." *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985).

The Release states that PIIC is released from "all claims, demands, causes of action, and damages asserted in, arising out of, or connected with the Litigation." After stating which claims are released, the Release then specifies that "any other claims, demands, causes of action, and

---

[2] For example, in its Memorandum in Support of its Motion for Summary Judgment, PIIC stated "[a]s articulated in PIIC's Answer and Grounds for Defense as well as its Counterclaim, the plain and unambiguous language of the Release bars the claims alleged in NHF's Complaint." (Doc. 27 at page 11). Similarly, NHF stated in its Memorandum in Support of its Motion for Summary Judgment that the Release is "complete on its face and is plain and unambiguous in its terms." (Doc. 30 at page 8).

[3] For example, the parties have submitted depositions, affidavits, and interrogatory responses of various parties taken as part of the current action, which the parties assert reflect their beliefs about the meaning of the Release at the time it was entered. They have also submitted (i) Plaintiff's Second Amended Petition from the Litigation; (ii) various documents from the Litigation; (iii) a transcript from the October 19, 2010 hearing in which the parties informed the judge presiding over the Litigation that they had reached a settlement agreement and described the agreement; (iv) prior versions of NHF's economic damages calculations drafted during the Litigation; (v) and earlier drafts of the Release that were not ultimately adopted.

damages ('Other Claims')" are not released. Thus, the Release's plain language unambiguously creates two separate and distinct claim sets: (1) claims asserted in, arising out of, or connected with the Litigation, and (2) <u>other</u> claims outside of this set of claims. The use of the word "other" in distinguishing the released claims from those not released establishes the non-intersecting claim sets. The parties' use of the term "other" to modify "claims, demands, causes of action, and damages" is clearly intended to show that the set or universe of claims released is separate and distinct from the set or universe of claims not released. To conclude otherwise is to give no meaning or effect to the term "other," which would violate the tenet of Texas law requiring that courts "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coke*, 650 S.W.2d at 393 (emphasis in original).

It is important to recognize that the Release designedly uses broad terms in defining the released claim set: "all claims...asserted in, arising out of, or connected with the Litigation." Thus, this released claim set includes not just those claims asserted in the Litigation, which are set forth in part in the Release's Recitals, but also those claims "arising out of, or connected with" that case. And in this regard, Texas courts have recognized that the phrase "arising out of" does not necessarily require direct or proximate causation but instead connotes the much broader "but for causation." *Utica Nat. Ins. Co. of Texas v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) (citing *Mid–Century Insur. Co. v. Lindsey*, 997 S.W.2d 153,156 (Tex.1999)); *Am. Motorists Ins. Co. v. Steel*, 229 S.W.2d 386, 389 (Tex. Civ. App. 1950). In other words, claims arising out of the Litigation include those claims that NHF would not have incurred but for the bankruptcy, which NHF claimed in the Litigation was caused by PIIC's wrongful denial of coverage. Similarly expansive is the phrase "connected with." Webster's Third New

9

International Dictionary teaches that "connected" means "joined or linked together" or "having the parts or elements logically related or continuous." Webster's Third New International Dictionary 480 (Philip B. Gove, ed., 1993). It remains to apply these principles and conclusions to the four claims asserted in the current case.

First, the Release's plain terms point persuasively to the conclusion that the indemnification claims for the $590,000 settlement of the Highbourne/Behrmann claim and the $929,491.94 settlement of the Townsley claim are not included in the set of released claims. These settlements were not asserted in, do not arise out of, and are in no way connected with the Litigation. Highbourne, the Behrmanns, and Townsley could have sued NHF alleging that they were fraudulently induced to invest in NHF, or that NHF breached its fiduciary duty, whether or not NHF was in bankruptcy. There is no "but for" or other causal connection between NHF's bankruptcy and these settlements; they are, like the decline in the birth rate in Denmark and the decline in the stork population,[4] not causally related. Accordingly, the settlements are not released and can be brought in the current suit.[5]

The defense costs incurred in defending against the Highbourne/Behrmann settlement and the Townsley settlement stand on different footing, as counsel for NHF conceded that these defense costs were included in the $2.9 million of professional fees asserted in the Litigation and settled with the Release.[6] Based on this statement, these defense costs are barred because they

---

[4] This is a classic example of the *post hoc, ergo propter hoc* fallacy: mere association is not causation. *See, e.g.*, Poul K. Faarup and Kenneth Hansen, *Market Research and Statistics* 154 (Jacob A. Hansen, ed., 2010).

[5] Given this conclusion, it is unnecessary at this time to reach NHF's argument that claims asserted in, arising out of, or connected with the Litigation may still be brought under other policies.

[6] During the September 14, 2012 hearing, the following exchange occurred:

10

were listed in the Release's Recitals as having been asserted in the Litigation. NHF nonetheless argues that these defense costs fall within the set of claims not barred by the Release because they are brought under the 2008-2009 policy, rather than the 2005-2006 policy. This argument fails because construing the Release in accordance with standard grammatical principles makes clear that the claims eligible to be brought under other policies must still be "Other Claims," *i.e.*, claims that were not asserted in, did not arise out of, or were not connected with the Litigation. Because counsel concedes that these claims were asserted in the Litigation, they are not "Other Claims." Therefore, all defense costs incurred in reaching these settlements were asserted in the Litigation and are therefore within the set of released claims in the Release.

The costs of defending against the Anderson claim are also barred, as counsel for NHF conceded during the September 14th hearing.[7] The defense costs associated with the Anderson claim are also barred by the Release because, unlike the Highbourne/Behrmann and Townsley

---

> THE COURT: Some of the damages that you say overlap [between this lawsuit and the Litigation] are attorney's fees?
> ATTORNEY LOCKERBY: Attorney's fees, so if you had the Venn diagram of two circles, the one on the left is Texas, the one on the right is Virginia. Where the two circles overlap would be attorney's fees from the Bankruptcy Court.
> THE COURT: Are the defense costs associated—for example, with the Highborn-Berman [sic] claim and the Townsley claim or the Anderson claim, for that matter, are they included in the professional fees incurred in connection with bankruptcy of 2.9 million sought in the Texas State Court litigation?
> ATTORNEY LOCKERBY: They are, your Honor.

Transcript from the hearing held September 14, 2012, 13:19-14:7.

NHF also stated that "[t]here is some (but not complete) overlap between the damages that NHF sought in the Texas State Court Action and the damages sought in this Lawsuit," in its Opposition to PIIC's Motion for Summary Judgment (Doc. 35, p. 16).

[7] See *supra* n. 6.

settlements, the Anderson claim was disallowed because the bankruptcy court denied Ms. Anderson's Motion to Allow a Late-Filed Claim. The costs of defending against this motion and the Anderson claim grow out of and are connected with the bankruptcy because the Anderson claim was dismissed pursuant to the bankruptcy rules that bar tardy notice of claims. Thus, these costs are causally connected with the bankruptcy, arise out of the bankruptcy, and are therefore barred by the Release.

Finally, the Release's plain terms make clear that the defense costs associated with the appeal of the bankruptcy plan and the motion to stay are included in the set of released claims and are therefore barred in the current lawsuit. Certain of NHF's creditors appealed the original bankruptcy plan because it released NHF's directors and officers from liability. Unlike the claims associated with the settlements and the costs of defending against the settlements, these defense costs exist only as a result of the bankruptcy proceeding; there is plainly at least a but for causal connection between the bankruptcy and the costs of the appeal and stay, and hence these costs arise out of, and are connected with, the Litigation. The fact that some of these costs were incurred after the Release was signed in no way alters this causal connection. These future claims arose out of the bankruptcy, as did the costs incurred up to the time the Release was signed. Nor is it persuasive to argue, as NHF does, that these costs come under policies other than the 2005-2006 policy and hence are "Other Claims" not barred by the Release. These costs are not claims under an insurance policy at all; they are simply costs NHF incurred in connection with the bankruptcy which are part of the consequential damages sought in the Litigation. Therefore, it is immaterial what policy any bankruptcy-related damages are asserted under, as they are not really insurance claims at all. The costs incurred defending against the appeal of the plan or the stay arise out of the bankruptcy, are barred, and cannot be brought in the current suit.

In summary, the Release does not bar NHF's claims for the Highbourne/Behrmann settlement and the Townsley settlement, but it does bar NHF's claims for the defense costs associated with the Highbourne/Behrmann settlement, the defense costs associated with the Townsley settlement, the defense costs associated with the Anderson claim, and the defense costs associated with the appeal of the bankruptcy plan and the related motion to stay. Therefore, PIIC's motion for summary judgment is granted insofar as PIIC seeks dismissal of NHF's claims for the defense costs associated with the Highbourne/Behrmann settlement, the defense costs associated with the Townsley settlement, the defense costs associated with the Anderson claim, and the defense costs associated with the appeal and motion to stay. It is denied in all other respects, including insofar as PIIC seeks dismissal of the Highbourne/Behrmann settlement and the Townsley settlement. NHF's motion for summary judgment on PIIC's counterclaim and related fourth defense in PIIC's answer is granted insofar as NHF seeks dismissal of PIIC's counterclaim and fourth defense with respect to the Highbourne/Behrmann settlement and the Townsley settlement. It is denied in all other respects. The case therefore proceeds on NHF's allegations with respect to the Highbourne/Behrmann settlement and the Townsley settlement.

An appropriate Order will issue.

Alexandria, Virginia
October 25, 2012

T. S. Ellis, III
United States District Judge